# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or
identify the person by name and address)*

8000 Telegraph Road, Apartment
#40, Downey, California 90240

)
)
)
)
)
)
)

Case No. 18-2674M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1001(a) | False Statements to Government Agency |
| 18 U.S.C. Section 1015 | False Statement in Immigration Proceeding |
| 18 U.S.C. Section 1425(a) | Unlawful Procurement of Naturalization |
| 18 U.S.C. Section 1542(a) | Use of A Passport Procured By False Statements |
| 18 U.S.C. Section 1544 | Misuse of a Passport |
| 18 U.S.C. Section 1621 | Perjury |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    October        , 2018

_____
*Judge's signature*

City and state:  Los Angeles, CA

KAREN l. STEVENSON, U.S. Magistrate Judge
*Printed name and title*

AUSA: Annamartine Salick (213) 894-3424

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

8000 Telegraph Road, Apartment #40, Downey, California, 90240.

This location is identified by a tall sign in front of the complex that states, "8000 Seville Apartments".  The complex is a two-story, dark brown structure in the shape of a rectangle with entry and egress located on the Westside of the complex, facing Tweedy Lane.  The complex is a gated community with apartments on the lower and upper levels.  Apartment # 40 is on the upper level with a white numbered 40 on the door.  An air conditioner unit is visible to the right of the apartment door.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1001(a) (False Statements to Government Agency); 18 U.S.C. § 1015 (False Statement in Immigration Proceeding); 18 U.S.C. § 1425(a) (Unlawful Procurement of Naturalization); 18 U.S.C. § 1542(a) (Use of A Passport Procured By False Statements); 18 U.S.C. § 1544 (Misuse of a Passport); and 18 U.S.C. § 1621 (Perjury), (collectively, the "Subject Offenses"), namely:

a.   All documents, records, programs, applications, or materials related to Vallmoe Shqaire's ("SHQAIRE"), also known as "Mohamad Shqaire" and "Mahmad Hadr Mahmad Shakir," immigration into the United States, including his B2 visa, Form I-485, (Application to Register Permanent Residence or Adjust Status), Form N-400 (Application to Become a United States Citizen), and Naturalization Certificate.

b.   SHQAIRE's United States Passport and any other passport or forms of identification in SHQAIRE'S name and/or variants of SHQAIRE'S name or anyone else;

c.   All documents, records, programs, applications, or materials related to the Palestinian Liberation Organization ("PLO"), Fatah, and the "Shabeba Cell."

d.   All documents, records, programs, applications, or materials related to Israel's investigation into SHQAIRE and his arrest, conviction, criminal proceeding, and sentence.

e.   All documents, records, programs, applications, or materials related to SHQAIRE's domestic and international travel, including airline tickets, receipts, and itineraries;

f.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

g.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar

facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, with respect to SHQAIRE, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other

court order.

**AFFIDAVIT**

I, Daniel A. Rocha, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and have been so employed with HSI since 2004.  I am currently assigned to the Joint Terrorism Task Force ("JTTF") for the Los Angeles office of HSI.  Since entering duty, I have conducted multiple investigations into immigration fraud, criminal visa fraud, and human trafficking and smuggling.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I attended Criminal Investigator Training and HSI Special Agent Training.  I have personally participated in this investigation and have received information from other law enforcement officials.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search the residence located at 8000 Telegraph Road, Apartment #40, Downey, California 90240, ("SUBJECT PREMISES"), further described in Attachment A, for evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 1001(a) (False Statements to Government Agency); 18 U.S.C. § 1015 (False Statement in Immigration Proceeding); 18 U.S.C. § 1425(a) (Unlawful Procurement of Naturalization); 18 U.S.C. § 1542(a) (Use of A Passport Procured By False

Statements); 18 U.S.C. § 1544 (Misuse of a Passport); and 18 U.S.C. § 1621 (Perjury), (collectively, the "Subject Offenses").

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates set forth below are on or about the dates indicated.

### III. <u>PREMISES TO BE SEARCHED</u>

4.    The premises to be searched is located at 8000 Telegraph Road, Apartment #40, Downey, California, 90240, located within the Central District of California and further described in Attachment A.

### IV. <u>SUMMARY OF INVESTIGATION</u>

5.    HSI is investigating Vallmoe Shqaire ("SHQAIRE"), also known as "Mohamad Shqaire" and "Mahmad Hadr Mahmad Shakir," a Palestinian-born, Jordanian citizen who was granted United States Citizenship on November 6, 2008.  Following SHQAIRE's acquisition of citizenship, HSI learned that SHQAIRE made materially false statements under penalty of perjury in connection with his naturalization application and interview. Specifically, SHQAIRE attested under oath that:

(1) he had never been arrested for or convicted of a crime or served time in jail or prison; (2) he had never been a member of or associated with any organization, association, fund, foundation, party, club, society or similar group in the United States or in any other place; and (3) he had never given false or misleading information to any United States government official while applying for an immigration benefit.

6.   Documents received from Israel via Mutual Legal Assistant Treaty ("MLAT") requests show that SHQAIRE was, in fact:  (1) arrested, charged, and convicted of being a member of the Palestinian Liberation Organization's ("PLO") "Shabeba"[1] cell; (2) was arrested, charged, and convicted in Israel of, *inter alia*, placing an Improvised Explosive Device ("IED") on an Israeli bus on December 11, 1988; and (3) served approximately 4 years in prison for these offenses.  In addition, a review of SHQAIRE's June 5, 2002 application to become a Lawful Permanent Resident ("LPR"), shows that SHQAIRE falsely stated under penalty of perjury, as he did in his 2008 naturalization application, that he had never been arrested, cited, indicted, fined or imprisoned for breaking or violating any law or ordinance.

---

[1] Based on my investigation into this matter and my conversations with other law enforcement personnel, I understand the "Shabeba" cell to be a small, informal group that supports the PLO.

## I.   <u>LEGAL BACKGROUND</u>

**A.   <u>Applicable Statues</u>**

7.   Based upon my training and consultations with the United States Code, I know the information set forth in the sub-paragraphs below:

a.   The relevant text of 18 U.S.C. § 1001(a) is as follows:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> Shall be fined under this title, imprisoned not more than 5 years . . . or both.

b.   The relevant text of 18 U.S.C. § 1015 is as follows:

> Whoever knowingly makes any false statement under oath, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization, citizenship, or registry of aliens . . . Shall be fined under this title or imprisoned not more than five years, or both.

c.   The relevant text of 18 U.S.C. § 1425(a) is as follows:

> Whoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship . . . shall be fined under this tittle or imprisoned not more than . . . 10 years, or both.

a.   The relevant text of 18 U.S.C. § 1542 is as follows:

Whoever willfully and knowingly uses or attempts to use . . . any passport the issue of which was secured in any way by reason of any false statement – Shall be fined under this title, imprisoned not more than . . . 10 years, or both.

b.   The relevant text of 18 U.S.C. § 1544 is as follows:

Whoever willfully and knowingly uses or attempts to use any passport in violation of the conditions or restrictions therein contained, or of the rules prescribed pursuant to the laws regulating the issuance of passports . . . shall be fined under this tittle or imprisoned not more than . . . 10 years, or both.

c.   The relevant text of 18 U.S.C. § 1621 is as follows:

Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury and shall . . . be fined under this tittle or imprisoned not more than five years, or both.

## B.   **The Palestinian Liberation Organization and Fatah**

8.   I know based on my training and experience, conversations with other law enforcement personnel, and my review open-source news reports and United States Congressional publications that:

5

a.    The PLO is a political entity dedicated to the "liberation of Palestine" through violent, armed struggle. Since the early 1960's, the PLO has operated as a government in exile within the disputed territories of the West Bank and Gaza, currently held by Israel.  The PLO is an umbrella group that includes a wide-range of secular and religious factions and ideologies.  Fatah is the PLO's largest faction and is similarly dedicated to the establishment a Palestinian state in the disputed territories currently held by Israel.

b.    In 1993, the PLO and Israel signed the Oslo Peace Accords that granted the Palestinians the right to self-govern the Gaza Strip and portions of the West Bank through the newly created Palestinian Authority.  In exchange, the PLO recognized Israel's right to exist and formally rejected violence and terrorism.

c.    Prior to the signing of the Oslo Peace Accords, the PLO was committed to an armed struggle against Israel and was recognized as a terrorist organization by the United States and other countries.  In 1987, the United States Congress found that the PLO and its affiliates were responsible for the murder of dozens of Americans and determined that the PLO and its affiliates were "terrorist organization[s] and a threat to the interest of the United States, its allies, and to intentional law."

### V.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    <u>Review of SHQAIRE'S Immigration File</u>**

9.    Based upon my conversations with United States Citizenship and Immigration Services ("USCIS") Officers and HSI SAs, I know the information set forth in the sub-paragraphs below:

a.    USCIS is the agency within Department of Homeland Security that is charged with administrating the legal process used by foreign nationals to immigrate to the United States. USCIS is responsible for the administration of the immigration and naturalization adjudication functions and for establishing immigration services and policies.

b.    The term "A-File" refers to an Alien Registration File, maintained by USCIS, that contains immigration records for aliens admitted to, or found within, the U.S.  These records can include, but are not limited to, photographs, fingerprints, employment-related documents, and immigration petitions filed by, or on behalf of, an alien.

c.    A United States visa is a travel document authorizing citizens of a foreign country to enter the United States for specific purposes, such as tourism, business, or employment.  A B2 visa temporary authorizes a foreigner to enter and reside in the United States for the purpose of tourism.

d.    One way to apply to become a United Sates citizen is for a qualifying relative of the individual, such as a spouse, to file a DHS USCIS Form I-130, Petition for Alien

Relative.  This form establishes the relationship between the qualifying relative (petitioner) and the individual.

e.   Once the Form I-130 is approved (and depending on other criteria, such as, if the individual is an immediate relative of a United States citizen or if the priority date on the Department of State's Visa Bulletin is current), the individual may then apply to become a Lawful Permanent Resident ("LPR") by filing the Form I-485, Application to Register Permanent Residence or Adjust Status.  An LPR enjoys a variety of benefits certain visa holders do not, such as the right to work while in the United States.  The Form I-485 is a questionnaire the applicant fills out under penalty of perjury. Following an investigation, USCIS interviews the applicant, places the applicant under oath, asks that the applicant re-affirm under penalty of perjury the answers contained in the Form I-485 and any other statements the applicant made during the interview are all true.

f.   After five years, or three years if the LPR is filing as the spouse of a United States citizen, an LPR may apply to become a naturalized citizen via the Form I-400.  The N-400 is a questionnaire, similar to the I-485, which the applicant fills out under penalty of perjury.  USCIS conducts an interview of the applicant and the applicant must re-affirm under penalty of perjury that the answers from the Form N-400 and any other statements made during the interview are all true.

g.   USCIS will notify the applicant if the naturalization application is granted, continued, or denied.  If

the application is granted, the applicant will appear for a naturalization ceremony and take the Oath of Allegiance to the United States, at which time the applicant becomes a citizen.

10.   I reviewed SHQAIRE's A-file and conducted interviews with SHQAIRE'S associates and learned the information summarized in the sub-paragraphs below:

a.   SHQAIRE listed his date and place of birth in the Form I-485 as September 17, 1967 and Palestine, respectively. In the Form N-400, SHQAIRE listed his place of birth as Jordan. I know from my training and experience that individuals born in Palestine often list Jordan as their place of birth or country of citizenship because many countries do not recognize Palestine as a country.

b.   SHQAIRE entered the United States on a B2 visitor's visa on September 24, 1999.

c.   Later that year, SHQAIRE married an American citizen in Los Angeles, CA.  During an HSI interview of this American citizen, ("N.A."), on March 24, 2016, N.A. admitted that marriage was fraudulent.  N.A. stated that she was paid $500 to marry SHQAIRE, whom she met for the first time at the marriage ceremony on November 11, 1999.

d.   On March 7, 2001, N.A. filed an I-130 (Petition for Alien Relative).  The petition was denied because N.A. and SHQAIRE divorced in 2002 while the application was pending.

e.   Following his divorce from N.A., on April 9, 2002, SHQAIRE married a second woman, ("V.H"), a naturalized-American citizen from Vietnam.  During an HSI interview on March

10, 2016, V.H. stated that the marriage was legitimate and that she divorced SHQAIRE in 2010 because he was unfaithful.

       f.   On June 5, 2002, V.H. submitted a Petition for Alien Relative and Application for Adjusted Status.  The application was approved on November 5, 2004.

       1.   <u>SHQAIRE Obtains Lawful Permanent Resident Status by Making Materially False Statements</u>

11.  Based on my review of SHQAIRE'S I-485 application, I learned the following:

       a.   On June 5, 2002, SHQAIRE applied to become an LPR via a Form I-485.  SHQAIRE declared under penalty of perjury that the application and evidence submitted was "all true and correct."

       b.   SHQAIRE made the following attestations on the Form I-485 under oath that, based on the evidence described herein in Part B, were later determined to be false:

> Part 3. Part C:  List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society or similar group in the United States or in other places since your 16th birthday.
>
> Answer:  None.
>
> Part 3. Question 1(b):  Have you ever, in or outside the U.S. been arrested, cited, charged, indicted, fined or imprisoned for breaking or violating any law or ordinance, excluding traffic violations?
>
> Answer:  No.
>
> Part 3. Question 4:  Have you ever engaged in, conspired to engage in, or do you intend to engage in, or have you ever solicited membership or funds for, or have you through any means ever assisted or provided any time of material support to any person or

organization that has ever engaged or conspired to engage in sabotage, kidnapping, political assassination, hijacking or any other form of terrorist activity?

Answer:  No.

c.  SHQAIRE signed the application on June 5, 2002, and certified "under penalty of perjury" that the "application and the evidence submitted with it is true and correct."

12.  I know from my conversations with USCIS Officer Peter Palinay that on November 5, 2004, Officer Palinay interviewed SHQAIRE in connection with his I-485 application.  SHAQIRE was placed under oath and reaffirmed that the answers on his I-485 application were true.  That same day, USCIS approved SHQAIRE's I-485 application and his immigration status was adjusted to become an LPR.

2.  <u>SHQAIRE Secures Citizenship by Making Materially False Statements under Oath</u>

13.  Based on my review of SHQAIRE'S N-400 application, I learned the following:

a.  On August 9, 2007, SHQAIRE applied to become a naturalized citizen via an N-400 application.  As part of the application, SHQAIRE certified under penalty of perjury that the application and the evidence submitted with it were "all true and correct."

b.  SHQAIRE made the following attestations under oath that, based on the evidence described herein in Part B, were later determined to be false in his N-400 application:

11

Section B: Affiliations, Question 8(a):  Have you ever been a member of or associated with any organization, association, fund, foundation, party, club, society or similar group in the United States or any other place?

Answer:  No.

Section B: Affiliations, Question 9(c):  Have you ever been a member of or in any way associated (either directly or indirectly) with:  A terrorist organization.

Answer:  No

Section B: Affiliations, Question 10:  Have you ever advocated (either directly or indirectly) the overthrow of any government by force or violence?

Answer:   No.

Section B: Affiliations, Question 11:  Have you ever persecuted (either directly or indirectly any person because of race, religion, national origin, membership in a particular social group or political opinion.

Answer:  No.

Section D: Good Moral Character, Question 16:  Have you ever been arrested, cited or detained by any law enforcement officer . . . for any reason?

Answer:  No.

Section D: Good Moral Character, Question 17:  Have you ever been charged with committing any crime or offense?

Answer:  No.

Section D: Good Moral Character, Question 18:  Have you ever been convicted of a crime or offense:

Answer:   No

Section D: Good Moral Character, Question 21:  Have you ever been in jail or prison?

Answer:  No

Section D: Good Moral Character, Question 23:  Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?

Answer:  No

Section D:  Good Moral Character, Question:  Have you ever lied to any U.S. government official to gain entry or admission into the United States?

Answer:  No

c.    On August 9, 2007, SHQAIRE certified, under penalty of perjury, that the application and all evidence submitted with it were true and correct.

14.   On October 7, 2008, USCIS Officer Sharise Jackson interviewed SHQAIRE in connection with his N-400 Application. According to my review of interview reports of two interviews HSI conducted with Officer Jackson, I learned the following:

a.    In 2008, while serving as a naturalization adjudication officer with USCIS, Officer Jackson had the power to grant or deny naturalization applications.

b.    Officer Jackson reviewed SHQAIRE's 2008 N-400 application and recognized her handwritten notes and signature on the application.  Officer Jackson explained that, per USCIS policy, after an applicant is placed under oath, the USCIS officer records the applicant's interview answers in red pen and

then numbers any additional questions and records the answers asked during the interview.

     c.    According to the notations on SHQAIRE'S N-400 application, SHQAIRE was placed under oath and asked to re-affirm each answer of his written application.  He did so in the affirmative.

     d.    Officer Jackson stated that had SHQAIRE provided complete and truthful answers, she would have requested additional documentation regarding his prior convictions and PLO membership.  Officer Jackson explained that such information is material to her determination.

    15.  In addition to re-affirming under penalty of perjury the answers SHQAIRE previously submitted to USCIS via the written N-400 application, SHQAIRE made the following responses under oath that were later determined to be false:

> Section B: Affiliations, Question 11:  Have you ever persecuted (either directly or indirectly any person because of race, religion, national origin, membership in a particular social group or political opinion.

> *In Officer Jackson's Handwriting*: "(9): States no".

> Section D: Good Moral Character, Question 16:  Have you ever been arrested, cited or detained by any law enforcement officer . . . for any reason?

> *In Officer Jackson's Handwriting:* "(10) States no".

> *In Officer Jackson's Handwriting*: "(11) States no arrest or court".

> Section D:  Good Moral Character, Question:  Have you ever lied to any U.S. government official to gain entry or admission into the United States?

> *In Officer Jackson's Handwriting*: "(12) States no".

14

a.    On October 7, 2008, SHQAIRE signed the following

certification in the presence of Officer Jackson:

> I swear (affirm) and certify under penalty of perjury
> under the laws of the United States of America that I
> know the contents of this application for
> naturalization subscribed to me, including corrections
> numbered 1 through 12 . . . are true and corrected to
> the best of my knowledge.

b.    Following SHQAIRE'S sworn affirmation, USCIS

granted SHQAIRE'S N-400 application and on November 6, 2008,

SHQAIRE took the oath of allegiance and was awarded United

States citizenship.

**B.    <u>Israeli Court Records Show that SHQAIRE was Arrested,
Convicted, and Served Approximately 4 Years in Prison
for Placing an IED on a Bus and for Being a Member of
the PLO</u>**

16.    According to certified court records received from

Israel pursuant to MLAT requests:

a.    "Mahmad Hadr Mahmad Shakir," born 1967, was

arrested on May 27, 1990 and charged in a five-count indictment.

The charges stem from a December 19, 1988 incident in which

SHQAIRE, acting on the direction of a PLO cell, the "Shabeba"

cell, and another man constructed an IED and placed the IED on a

bus used by Israelis.

b.    Specifically, the indictment charges SHQAIRE

with:  (1) membership in an unlawful organization, to wit, the

"Shabeba" cell of the PLO; (2) activity directed against public

order; (3) incitement and hostile propaganda; (4) placing a bomb

in December 1988 on an Israeli bus with the intent to cause

15

death or harm; and (5) activity against public order, specifically assaulting persons suspected of cooperating with the Israelis.

17.  The Israeli authorities also provided the palm and fingerprints taken from "Mahmad Hadr Mahmad Shakir" at his arrest in 1990.

18.  On February 1, 2016, the HSI Forensic Laboratory compared the palm and fingerprints provided by the Israeli authorities with fingerprints taken from SHQAIRE in September 2010, and determined that the fingerprint impressions belonged to the same individual.

**C.   <u>SHQAIRE Admits to Law Enforcement that he was Arrested, Convicted, and Served Time in Prison in Israel and was a Member of Fatah</u>**

19.  According to reports I reviewed and my conversations with law enforcement personnel, I learned the following:

a.   On September 15, 2010, Los Angeles County Detective Chad Watters and Federal Bureau of Investigations SA Michael Young interviewed SHQAIRE following his arrest at the West Hollywood Sherriff's Station.  After being advised of his "Miranda rights," SHQAIRE voluntarily agreed to speak with the Detective Watters and SA Young.

b.   SHQAIRE stated that he was part of Fatah.

c.   SHQAIRE stated that he was arrested and incarcerated in Israel on two different occasions.

d.   SHQAIRE stated that when he was in college in Palestine he became active in anti-Israeli demonstrations.  He stated that he was young and stupid at the time but was

influenced by seeing innocent Palestinian men, women, and
children injured or killed by Israelis.  SHQAIRE claimed he
would have never participated in events if he knew the
consequences.

     e.   SHQAIRE claimed that he did not remember if he
disclosed his criminal record or involvement with the PLO in his
applications to become an LPR or citizen.

    20.  According to Los Angeles County Superior Court
certified court records, SHQAIRE pleaded guilty to three counts
of grand theft, in violation of California Penal Code Section
487(a) on July 29, 2011, and was sentenced to 120 days'
imprisonment, five years' probation, and ordered to pay $75,266
dollars in restitution.

    **D.**   **SHQAIRE Uses his Unlawfully-Acquired Citizenship to**
       **Fraudulently Acquire a U.S. Passport and Uses the**
       **Passport to Travel Internationally on Six Occasions**

    21.  According to my review of SHQAIRE's United States
Passport application on file with the United States Department
of State, SHQAIRE applied for a United States Passport in 2008
and provided his Naturalization Certificate as proof of
citizenship.  On November 6, 2008, the Department of State
approved SHQAIRE'S United States Passport application.

    22.  According to a law enforcement database and airline
records I reviewed, SHQAIRE traveled internationally, departing
from and arriving at United States airports, on May 4, 2009, May
18, 2009, May 15, 2012, June 5, 2012, April 15, 2018, and May 7,
2018.  Based on my conversations with United States Customs and
Border Patrol ("CBP") officers, I know that a person traveling

internationally at an airport or port of entry must provide
proof of citizenship and identity, usually in the form of a
passport.  Based on the above recited facts, there is probable
cause to believe SHQAIRE obtained and used his United States
Passport unlawfully by making materially false statements in
connection with his application to become a United States
citizen, in violation of 18 U.S.C. § 1542(a) (Use of A Passport
Procured By False Statements); 18 U.S.C. § 1544 (Misuse of a
Passport).

**E.    Grand Jury Returns Indictment Charging SHQAIRE with Unlawful with Procurement of Naturalization**

23.   On September 28, 2018, a grand jury sitting in the
Central District of California, returned an indictment,
CR. No. 18-656-JFW, chagrining SHQAIRE with a single count of
Unlawful Procurement of Naturalization, in violation of
18 U.S.C. § 1425(a), based on three materially false statement
SHQAIRE made in connection with his October 7, 2008
naturalization interview, namely:  (1) that he had never been
arrested for or convicted of a crime or served time in prison;
(2) that he had never been a member of or associated with any
organization, association, fund, foundation, party, club,
society or similar group in the United States or in any other
place; and (3) that he had never given false or misleading
information to any U.S. government official while applying for
an immigration benefit.  The indictment remains under seal
pending SHQAIRE's arrest.

**F.   SHQAIRE Resides at the SUBJECT PRESMIES**

24.   According to California Department of Motor Vehicle
("DMV") Records, SHQAIRE's current address on file with the DMV
is 8000 E. Telegraph Road, Apt. 40, Downey, CA, 90204, the
SUBJECT PREMISES.   The SUBJECT PREMISES is also on file as
SHQAIRE's current address in several law enforcement and public
records databases.

25.   On October 4, 2018, I surveilled 8000 E. Telegraph
Road, an apartment complex in Downey, CA.   I observed an
apartment directory that lists each unit number and the
corresponding tenant's last name.   "Shqaire" was listed as the
resident of Apartment 40.   I did not observe SHQAIRE at the
apartment complex on that day.

26.   I know based on my training and experience that
individuals commonly maintain originals and copies of important
documents, such as passports and immigration documents at their
residence.   An individual who travels often is likely to keep
their passport in an easily accessible, but safe location, like
their home or office.   In addition, people often maintain
records of their international travel, including airline
tickets, itineraries, and travel receipts for long periods of
time at their homes.   Thus, it is likely, immigration documents,
travel documents, and SHQAIRE's United States Passport will be
found at the SUBJECT PREMISES.

**VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

27.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

     a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult

with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

could contain as many as approximately 450 full run movies or
450,000 songs.

          d.    Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[2]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed

---

[2] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

        f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on

the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby

traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

28. As discussed herein, based on my training and experience I believe that digital devices will be found during the search.

a. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five

fingerprints that can unlock a device.  Once a fingerprint is
registered, a user can unlock the device by pressing the
relevant finger to the device's Touch ID sensor, which on a cell
phone is found in the round button (often referred to as the
"home" button) located at the bottom center of the front of the
phone, and on a laptop is located on the right side of the
"Touch Bar" located directly above the keyboard.  Fingerprint-
recognition features are increasingly common on modern digital
devices.  For example, for Apple products, all iPhone 5S to
iPhone 8 models, as well as iPads (5th generation or later),
iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.
Motorola, HTC, LG, and Samsung, among other companies, also
produce phones with fingerprint sensors to enable biometric
unlock by fingerprint.  The fingerprint sensors for these
companies have different names but operate similarly to Touch
ID.

          c.   If a device is equipped with a facial-recognition
feature, a user may enable the ability to unlock the device
through his or her face.  To activate the facial-recognition
feature, a user must hold the device in front of his or her
face.  The device's camera analyzes and records data based on
the user's facial characteristics.  The device is then
automatically unlocked if the camera detects a face with

characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is
often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring
2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

      d.   While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To

28

activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

29.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

30.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can

occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.   I do not
know the passcodes of the devices likely to be found during the
search.

     31.  In my training and experience, the person who is in
possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.

     32.  For these reasons, if while executing the warrant, law
enforcement personnel encounter a digital device that may be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel

to, with respect to SHQAIRE: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

## VII. <u>CONCLUSION</u>

33.   For all the reasons described above, there is probable cause to believe that that SHQAIRE committed violations of 18 U.S.C. § 1001(a) (False Statements to Government Agency); 18 U.S.C. § 1015 (False Statement in Immigration Proceeding); 18 U.S.C. § 1425(a) (Unlawful Procurement of Naturalization); 18 U.S.C. § 1542(a) (Use of A Passport Procured By False Statements); 18 U.S.C. § 1544 (Misuse of a Passport); and 18 U.S.C. § 1621 (Perjury), and that for evidence, contraband, fruits, or instrumentalities of these criminal will be found in a search of the SUBJECT PREMISES.


_____
Daniel A. Rocha
Special Agent
Homeland Security Investigation

Subscribed to and sworn before
me on October____, 2018.


_____
UNITED STATES MAGISTRATE JUDGE